**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Civil Action No. 20-cv-00078-CMA-KASt

A.C. as parent of minor and next friend S.T.C.,

     Plaintiff,

v.

JEFFERSON COUNTY R-1 SCHOOL DISTRICT,
JEFF GOMEZ, and
WILLIAM CARLIN,

     Defendants.

---

**AMENDED ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND DENYING AS MOOT DEFENDANTS'
MOTION TO STRIKE TESTIMONY OF ANNIE MAXWELL**

---

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. # 134) and Motion to Strike Testimony of Annie Maxwell (Doc. # 154). For the following reasons, the Court grants in part and denies in part the Summary Judgment Motion and denies the Motion to Strike as moot.

## I.    <u>BACKGROUND</u>

This is a civil rights action against Jefferson County R-1 School District ("JeffCo"), former Everitt Middle School Principal Jeff Gomez, and former Everitt Middle School Vice Principal William Carlin (collectively "Defendants").[1] Unless otherwise

---

[1] Multiple documents refer to Defendant Carlin as "Tim Carlin" (Doc. # 134 at 2–3, 5, 8; Doc. # 142 at 9; Doc. # 149-11 at 1), however it appears all parties agree that "Tim Carlin" and the

indicated, the following facts are undisputed for the purposes of the summary judgment motion.[2]

Plaintiff S.T.C. was a student at Everitt Middle School, a JeffCo school, from 2016 to 2018 for seventh and eighth grades. (Doc. # 135 at 38.)[3] During her time at Everitt, Defendants Gomez and Carlin were the Principal and Vice Principal, respectively. (Doc. # 135-2 at 9, 14.) S.T.C. was sexually assaulted and harassed, predominately by two male students, R.R. and S.R., during her seventh-grade year. (Doc. # 135-1 at 10; Doc. # 135-2 at 6–7; Doc. # 149-6 at 1–2[4]; Doc. # 157-8 at 1.) R.R. and S.R. sexually assaulted and harassed S.T.C. multiple times, both at school and in other locations, including grabbing her breasts over and under her shirt, and putting their hands down her pants and underwear. (Doc. # 135-1 at 10; Doc. # 135-2 at 6–7; Doc. # 149-6 at 1–2; Doc. # 157-8 at 1.)

## A.    THE CULTURE AT EVERITT

S.T.C. alleges that a portion of these at-school assaults occurred as part of a pervasive culture of sexual assault and harassment at Everitt which preceded her

---

William Carlin named as Defendant in this litigation are one and the same. (Doc. # 29 at 1); *see also, e.g.*, (Doc. # 135 at 42; Doc. # 135-3 at 1.)

[2] In support of its findings of fact and legal conclusions, the Court does not rely on the contested affidavit of Annie Maxwell (Doc. # 149-3). *See* (Docs. ## 154, 160–61.)

[3] The Court cites the docket number (*e.g.*, Doc. # 135) and the page number applied by the court docketing system in blue in the header of each document (*e.g.*, Doc. # 135 at 38).

[4] Defendants assert that the Court should ignore S.T.C.'s affidavit (Doc. # 149-6), as well as the affidavits of her mother, A.C. (Doc. # 149-7), and of five former Everitt students (Docs. ## 149-1; Doc. # 149-2; Doc. # 149-4; Doc. # 149-5; Doc. # 149-9) as "sham affidavits" written to create disputes of fact. (Doc. # 156 at 10–11.) For the reasons discussed in detail in section III.A below, the Court will not disregard these affidavits in their entirety.

middle school experience by at least seven years. (Doc. # 135-2 at 42; Doc. # 135-8 at 5, 8–12; Doc. # 135-11 at 5, 7–10; Doc. # 157-4 at 3–10; Doc. # 157-5 at 4, 6–9; Doc. # 157-6 at 3, 6–11; Doc. # 157-10 at 4–8; Doc. # 157-11 at 4, 6–9.) Specifically, beginning as early as 2010, according to the testimony of former Everitt students, on Tuesdays students—mostly boys but also some girls—would grope, grab, or touch female students' breasts as part of "Titty Touch Tuesday" ("TTT"). *See, e.g.*, (Doc. # 135-11 at 8–10; Doc. # 135-18 at 5; Doc. # 157-4 at 4, 7–9.) Similarly, on Fridays students—again primarily boys—would slap or touch the butts of mostly female students as part of "Slap Ass Friday" ("SAF").[5] *See, e.g.*, (Doc. # 135-11 at 7–8; Doc. # 135-18 at 5, 9; Doc. # 157-4 at 4, 6–8.)

At least twelve former Everitt students, besides S.T.C., sat for depositions during the discovery phase of this case. (Docs. ## 135-8; 135-11; 135-13; 135-15; 135-17; 135-18; 157-3; 157-4; 157-5; 157-6; 157-10; 157-11.) Two additional students provided affidavits but were not deposed. (Docs. ## 135-19; 149-3.)[6] All the former Everitt students whose responses regarding TTT and SAF were provided to the Court had heard of this behavior. *See* (Doc. # 135-8 at 8–9; Doc. # 135-11 at 8–9; Doc. # 135-17 at 5–6; Doc. # 135-18 at 5, 7–8; Doc. # 135-19 at 1; Doc. # 157-3 at 3–4; Doc. # 157-4 at 6–10; Doc. # 157-5 at 6–8; Doc. # 157-6 at 6, 8–10; Doc. # 157-10 at 5–6; Doc. #

---

[5] Various names were reportedly used to describe this behavior. *See, e.g.*, (Doc. # 135 at 73; Doc. # 135-3 at 10–12.) No matter the exact phrasing, Defendants Gomez and Carlin, as well as the former Everitt students all described the same alleged behaviors. Therefore, the Court uses TTT and SAF to encompass all such alleged behaviors.

[6] One of these affidavits, that of former student Annie Maxwell (Doc. # 149-3) is the subject of Defendants' Motion to Strike (Doc. # 154.) The Court does not consider Ms. Maxwell's affidavit.

157-11 at 6.) Two students, G.A. and T.R., stated that they never witnessed or personally experienced TTT or SAF. (Doc. # 135-11 at 8–9; Doc. # 135-19 at 1.) At least nine of the deposed former Everitt students testified that they witnessed TTT and SAF and that they personally were groped, slapped, or touched as a part of one or both. (Doc. # 135-8 at 8–9; Doc. # 135-17 at 5–6; Doc. # 135-18 at 5–6, 9; Doc. # 157-3 at 3–4; Doc. # 157-4 at 6–10; Doc. # 157-5 at 6–8; Doc. # 157-6 at 8, 10; Doc. # 157-10 at 6; Doc. # 157-11 at 6.)

Some of the former students describe TTT and SAF as a "gimmick," a "game," or a "joke" that mostly occurred between friends. (Doc. # 135-8 at 8–9; Doc. # 135-17 at 5–6; Doc. # 135-18 at 5–9; Doc. # 157-3 at 3; Doc. # 157-5 at 8; Doc. # 157-6 at 6–7; Doc. # 157-10 at 5–6; Doc. # 157-10 at 5–6.) However, other former students testified that TTT and SAF happened every week, multiple times per day, were widespread and visible, and that the contact was often nonconsensual. (Doc. # 135-18 at 7–8; Doc. # 157-4 at 6–9; Doc. # 157-5 at 6–8; Doc. # 157-6 at 6–11; Doc. # 157-11 at 6, 8.) Several students are clear that experiencing TTT and SAF made them uncomfortable, and some believe it has had lasting impacts into their adult lives. (Doc. # 157-4 at 6–10; Doc. # 157-5 at 6–8; Doc. # 157-11 at 7.)

The parties agree that all the former Everitt students who testified during depositions regarding TTT and SAF stated they never told school administrators about these events. (Doc. # 135-8 at 8–10; Doc. # 135-9 at 7–10; Doc. # 135-16 at 8–9; Doc. # 135-11 at 7–10; Doc. # 135-17 at 5–6; Doc. # 135-18 at 7–8, 10.) Multiple students testified that they did not report TTT and SAF generally, or their personal experiences

with these behaviors, because they did not "think they had to" (Doc. # 135-18 at 7–8), did not think they could or did not know it was wrong (Doc. # 157-4 at 7–10), or because it was "so normalized" that they assumed administrators knew it was happening (Doc. # 157-6 at 8–10).

Defendants dispute that TTT and SAF were widespread, weekly phenomena at Everitt. (Doc. # 156 at 5.) Mr. Gomez testified that "within a year or two of his arrival at Everitt" students told him that they had heard TTT and SAF were happening at the school, and they were "concerned about it possibly happening to them." (Doc. # 135-6 at 24; Doc. # 149-16 at 7.) Mr. Carlin testified that he only heard TTT referenced once in an email sent by Mr. Gomez to Everitt staff to advise them that TTT had been reported to him, and to request staff to be in the hallways during passing period and to report anything they see to administrators. (Doc. # 135-3 at 9–12.)

Mr. Gomez asserted that he attempted to deal with student concerns about TTT and SAF by instructing teachers to stand in the hallways during Everitt's passing periods to supervised students, speaking directly to students and warning them that the school would not tolerate such behavior, and encouraging students to tell him personally or another trusted adult if TTT or SAF was happening to them. (Doc. # 135-6 at 13–15, 26–27); *see also* (Doc. # 135-8 at 7; Doc. # 135-9 at 5–6; Doc. # 135-10 at 4, 6; Doc. # 135-11 at 6; Doc. # 157-2 at 3–4.) One former student remembered an assembly during which students were told TTT and SAF were inappropriate and there would be consequences for students engaging in such behavior. (Doc. # 135-8 at 11–12.) However, in response to discovery requests by Plaintiffs for agendas or notes from

staff meetings, assemblies, or classroom discussions between August 2011 and December 2017 where TTT, SAF, or sexual assault and harassment were discussed, Defendants asserted that they "could not locate any documents in their respective possession, custody, or control responsive" to such requests. (Doc. # 149-17 at 3.)

Mr. Gomez testified that he did not "investigate rumors [of TTT and SAF] because nobody came forth saying that it was happening [to them personally]." (Doc. # 149-18 at 6.) One former student testified that a boy who touched her was told to stop by a teacher and received detention. (Doc. # 157-3 at 3–4.) The parties agree no other student was ever punished for participating in TTT or SAF. (Doc. # 135-6 at 15.)

S.T.C. alleges that she was told about TTT and SAF as part of an informal orientation for seventh graders. (Doc. # 149-6 at 1); *see also* (Doc. # 157-4 at 4; Doc. # 157-6 at 7–8 (testimony of other former Everitt students that people told them about TTT and SAF prior to, or when starting at Everitt.)) She averred that she was subjected to TTT and SAF every week during seventh grade. (Doc. # 149-6 at 1.) S.T.C. recalled telling her counselor Allison MacDonald, about TTT and SAF in the beginning of her seventh-grade year but asserted that Ms. MacDonald did not take any action. (*Id.* at 1–2; Doc. # 149-10 at 5.) Defendants dispute these allegations and state that S.T.C. did not tell any administrator, school counselor, teacher, therapist, law enforcement officer, or other adult—including her mother—about TTT, SAF, or her experiences being assaulted until May 2017. (Doc. # 135-1 at 6, 11; Doc. # 135-2 at 5, 15–17; Doc. # 157-7 at 3.)

**B.**   **S.T.C.'S REPORT AND AFTERMATH**

On May 15, 2017, S.T.C. told her mother, A.C., that she had been assaulted multiple times by R.R. and S.R at school and at other locations. (Doc. # 135-2 at 6, 16.) A.C. then called the school to report the alleged assaults and to request a meeting. (Doc. # 135 at 42; Doc. # 135-1 at 7.) Later that day, A.C. took S.T.C. to the Wheat Ridge Police Department ("WRPD") where S.T.C. reported the sexual misconduct to law enforcement. (Doc. # 135-1 at 8; Doc. # 147-11 at 1.)

The following day, A.C. and S.T.C. met with Mr. Carlin. (Doc. # 135-1 at 9; Doc. # 135-2 at 10.) A.C. recalled that S.T.C. told Mr. Carlin that R.R. and S.R. had touched S.T.C. under her shirt and on her underwear. (Doc. # 135-1 at 10; Doc. # 135-2 at 11.) S.T.C. recalled that Mr. Carlin told her, "this is how boys show you that they like you." (Doc. # 149-6 at 2); *see also* (Doc. # 149-7 at 1; Doc. # 157 at 7.) Mr. Carlin disputes that he said anything like this and rather asserts that he attempted to comfort S.T.C., to ascertain if any of the behavior may have been consensual, and to explain the process moving forward. (Doc. # 157-9 at 3–4.) This meeting was S.T.C.'s only contact with Mr. Carlin during seventh grade.[7] (Doc. # 135-2 at 14.) S.T.C. then wrote a statement in the presence of Ms. MacDonald who was a trusted adult at school. (*Id.* at 12, 23; Doc. # 157-8 at 1.) Defendants point out that there is no evidence that S.T.C. ever referenced TTT or SAF in her report of sexual misconduct to law enforcement, to Mr. Carlin, or in her written statement. (Doc. # 156 at 7 (citing Doc. # 157 at 7; Doc. # 157-1 at 7; Doc. # 157-8 at 1); *see also* (Doc. # 149-11.)

---

[7] S.T.C. had no contact with Mr. Gomez during seventh grade. (Doc. # 135-2 at 14.)

Mr. Carlin then spoke to Officer Krista Cuney, Everitt's school resource officer, who confirmed that S.T.C. had already reported the allegations to WRPD. (Doc. # 135-3 at 17–18.) Officer Cuney documented in her report that she spoke to Mr. Carlin on May 16, 2017. (Doc. # 147-11 at 2.) She recorded that Mr. Carlin told her he was not done with his investigation, which was necessary for pursuing school discipline. (*Id.*) Officer Cuney advised Mr. Carlin "that school discipline was his concern; however, it should not interfere with the police investigation." (*Id.*) She noted that Mr. Carlin then "became argumentative" and she told him that "he need[ed] to turn over everything he had up until the point [she] took over." (*Id.*) Mr. Carlin provided Officer Cuney S.T.C.'s statement and a witness statement.[8] (*Id.*)

On May 17, 2017, Mr. Carlin obtained written statements from S.R. and R.R.[9] (Doc. # 135 at 76–77; Doc. # 135-3 at 18.) R.R.'s statement admits that he "used to inappropriately touch" S.T.C. including touching her breast. (Doc. # 135 at 76.) S.R.'s statement confesses that he and R.R. touched S.T.C.'s breasts, that she told them to stop, and that this contact occurred at school and other locations. (*Id.* at 77.) Mr. Carlin suspended S.R. from May 27 through May 25, 2017—the last day of instruction at Everitt—and R.R. from May 22 to 25, 2017. (*Id.* at 74, 78–79.) Mr. Carlin testified that he advised Officer Cuney that he had interviewed and obtained statements from R.R.

---

[8] S.T.C.'s then-boyfriend, N.M., provided a witness statement to the school regarding the off-school incident he witnessed the weekend before S.T.C. reported to law enforcement and to Everitt administrators. (Doc. # 135 at 75.)

[9] R.R.'s statement is undated (Doc. # 135 at 77), but Plaintiffs do not dispute this date. (Doc. # 142 at 1.)

and S.R. but that he did not provide those statements to Officer Cuney because he didn't recall her asking for them. (Doc. # 135-3 at 19–23.)

R.R. and S.R. were permitted to sit for their final exams. (Doc. # 149-6 at 3.) S.T.C. testified that she sat in Ms. MacDonald's office during the examination period and did not take final exams. (Doc. # 157 at 9.) She testified that this was not a requested accommodation, she wanted to take her exams and she told Ms. MacDonald that. (*Id.*) S.T.C. asserted that in response Ms. MacDonald told her she could take the exams in her classrooms, but Ms. MacDonald could not guarantee that S.T.C. would be safe. (*Id.*)

A.C. asserted that over the summer she repeatedly asked law enforcement for a restraining order against R.R. and S.R. but was told by WRPD that without information possessed by the school, they would not be able to put a restraining order in place and that "the school wasn't cooperating with the police." (Doc. # 149-7 at 1–2; Doc. # 157-1 at 7–8.) However, on July 6, Detective Johnson documented that s/he and Officer Cuney "decided to wait until staff returns to school from summer break" to seek the remainder of the school's investigation. (Doc. # 149-11 at 5.) Defendants point out that S.T.C. testified that she and her mother chose not to obtain a civil restraining order that summer.[10] (Doc. # 135-2 at 31.)

---

[10] A.C. asserts that S.T.C., who was a minor in 2017, had no knowledge of how to obtain a restraining order. (Doc. # 149-7 at 1.) However, Defendants point out that S.T.C. did not express confusion or ask for clarification when questioned about a civil restraining order during her deposition, which occurred when she was an adult. *See* (Doc. # 135-2 at 31.)

Towards the end of July 2017, S.T.C. learned via social media that she was going to be in at least one class with at least one of her assailants (Doc. # 135-4 at 2; Doc. # 157 at 11–12.) This caused S.T.C. stress and anxiety. (Doc. # 149-6 at 3.) A.C. reached out to the school on July 24, 2017, to advise the administration of this scheduling issue and to ask, "what steps need to be taken to provide safety for [S.T.C.] during school hours." (Doc. # 135-4 at 2.) Mr. Gomez promptly responded and arranged a meeting to include Ms. MacDonald. (*Id.* at 1.) During this exchange, A.C. also informed Mr. Gomez that WRPD had told her no progress had been made on the police investigation because law enforcement was waiting for information from the school and believed they would have a hard time contacting school officials during the summer. (*Id.*); *see also* (Doc. # 149-11 at 2, 5.) Mr. Gomez responded that police could contact Mr. Carlin at school and stated that "[t]he police investigation and any possible charges will determine what next [steps] we take with [R.R.] and [S.R.]." (Doc. # 135-4 at 1.) Later that day A.C. reached out to WRPD to tell them Mr. Carlin could be reached at school. (Doc. # 135-1 at 13.) There is no evidence that police reached out to Mr. Carlin between May 16 and late September 2017. *See* (Doc. # 149-11.)

In early August, A.C., S.T.C., and S.T.C.'s grandmother met with Mr. Gomez and Ms. MacDonald to discuss S.T.C.'s eighth grade schedule. (Doc. # 135 at 42; Doc. # 135-1 at 15; Doc. # 135-2 at 21–22; Doc. # 135-5 at 6; Doc. # 135-7 at 9.) A.C. recalled that Mr. Gomez informed them that without a restraining order, the school could not remove R.R. or S.R. from the classes they were scheduled to have with S.T.C. (Doc. # 135-1 at 16.) It is undisputed that everyone in the meeting "agreed" that S.T.C.'s

schedule would be changed so she would not be in class with her assailants. (*Id.*; Doc. # 135-2 at 22; Doc. # 135-6 at 19.) At the time, Everitt was divided into two hallways, one with the advanced classes and one with the remedial classes. (Doc. # 149-6 at 3.) The change in S.T.C.'s schedule resulted in her moving from an advanced class into a remedial class. (*Id.*); *see also* (Doc. # 149-11 at 5.)

Ms. MacDonald testified that she would not have changed S.T.C.'s schedule unless S.T.C. and her mom "felt good about and happy with" the change. (Doc. # 135-7 at 10–12.) However, S.T.C. asserts that she was not happy with the change and only "agreed" because she could not be in classes with the boys. (Doc. # 149-6 at 3; Doc. # 149-7 at 1); *see also* (Doc. # 149-11 at 5.) Mr. Carlin was not involved in this discussion. (Doc. # 135-2 at 19–20; Doc. # 157 at 11.) A.C. left this meeting with the "impression . . . that the police were not doing their job to get the information [needed] to get a restraining order." (Doc. # 135 at 17.) That same day, she called WRPD and "yelled at" the detective investigating S.T.C.'s allegations. (*Id.*)

On the first day of school in mid-August, Mr. Gomez advised R.R. and S.R. that they were not to talk to, look at, or walk near S.T.C., and if they did, there would be consequences. (Doc. # 135 at 80; Doc. # 135-6 at 17.) There is no evidence that R.R. or S.R. thereafter contacted S.T.C. and S.T.C. never reported any additional contact between them. (Doc. # 135-2 at 26.) Despite this, S.T.C. experienced multiple challenges during eighth grade. *See* (Doc. # 135 at 42–43, 45, 54–55; Doc. # 135-1 at 18; Doc. # 135-2 at 23–25, 28; Doc. # 149-6 at 4; Doc. # 150-3 at 1; Doc. # 157 at 14, 18.)

On September 26, 2017, Officer Cuney documented that the detective assigned to S.T.C.'s case had asked her during the preceding summer to contact Mr. Carlin to request R.R. and S.R.'s written statements, but that "[u]p to this point [she] was not aware that there were . . . written statements from suspects as Carlin had told [her] he had given all the information in May." (Doc. # 149-11 at 2.) Officer Cuney then reached out to Mr. Carlin for any statements that had not been provided previously. (*Id.* at 2, 5.) Officer Cuney recorded that Mr. Carlin told her he had statements from R.R. and S.R., but he was "not sure [he] should give them to" Officer Cuney due to student privacy concerns. (*Id.*) According to her report, when Officer Cuney advised Mr. Carlin that the "statements were police evidence and he needed to surrender them," Mr. Carlin "became argumentative stating that he wanted to contact the 'district'" regarding his obligations. (*Id.*); *see also* (Doc. # 135-3 at 24.) Officer Cuney then told the detective that Mr. Carlin was "refusing to provide statements" and the detective notified superior officers of Mr. Carlin's "obstruction." (Doc. # 149-11 at 2, 5.) R.R. and S.R.'s statements were turned over to law enforcement by another school official the following day. (*Id.* at 5; Doc. # 135-3 at 24–25.)

On November 1, 2017, police arrested R.R. and S.R. in connection with S.T.C.'s allegations of sexual assault and harassment from the previous school year. (Doc. # 135-2 at 30.) That same day Mr. Gomez mailed a Title IX Outcome Letter to A.C. stating that the investigation had concluded with a finding that R.R. and S.R. had violated S.T.C.'s rights under Title IX. (Doc. # 135 at 56.) The letter also stated that the students had been disciplined and that the school would continue to offer support to S.T.C. (*Id.*;

Doc. # 135-1 at 23.) After their arrest R.R. and S.R. were transferred out of Everitt and a protection order was entered in their juvenile delinquency cases, preventing them from having contact with S.T.C. (Doc. # 135-2 at 30.)

Following R.R. and S.R.'s transfer out of Everitt, S.T.C. and her mother complained to Mr. Gomez and Ms. MacDonald that the boys' friends were harassing S.T.C. including telling her to kill herself, pushing her into lockers, and calling her a whore, slut, and liar. (Doc. # 135 at 43–44, 48.) Ms. MacDonald and Mr. Gomez both told S.T.C. that they needed to identify the students who were harassing her and asked for additional information on where and when she was pushed into lockers so they could review video footage. (*Id.* at 49–50; Doc. # 135-2 at 36.) On November 16, 2017, S.T.C. and Ms. MacDonald looked through yearbooks in an attempt to identify the boys who were harassing her. (Doc. # 135-2 at 36.) S.T.C. testified that apart from one boy, Q.P., she was not able to identify the responsible students. (Doc. # 157 at 21.) S.T.C. also agreed with Defense counsel's characterization that it was "logical" that if she could not identify the responsible students, the school could not address the harassment. (*Id.* at 22.) Mr. Carlin was not involved with any of S.T.C.'s reports of harassment during eighth grade.

S.T.C. disputes that she didn't identify any of the students who were harassing her. (Doc. # 145 at 4.) She points out that following her complaints, Mr. Gomez and Ms. MacDonald met with Q.P. and "seven other 8th grade boys to discuss expectations around Title 9 and understanding the importance of all students feeling safe at school." (Doc. # 135-6 at 22; Doc. # 149-14 at 1–2; Doc. # 149-15 at 1.) At this meeting the eight

boys were warned there "would be consequences" if it was determined they were harassing S.T.C. (Doc. # 135-6 at 23; Doc. # 149-14 at 1.) Mr. Gomez testified that this meeting was "proactive" and that the boys were "identified as friends" of S.R. and Q.P. (Doc. # 136-6 at 23.) Yet, Mr. Gomez emailed A.C. following this meeting and stated that he and Ms. MacDonald "took actions with those that S.T.C. states are involved." (Doc. # 149-15 at 1.) Q.P. was then removed from the classes he had with S.T.C. (Doc. # 135 at 72.) Mr. Gomez also reviewed video footage but did not find anything consistent with S.T.C.'s claims. (Doc. # 135-6 at 12, 28.)

S.T.C asserted that these boys continued to harass her and call her names. (Doc. # 149-6 at 5.) However, S.T.C. testified that following this incident in mid-November she did not make any additional reports of harassment to Mr. Gomez or Mr. Carlin during the remainder of her eighth-grade year. (Doc. # 157 at 22.) S.T.C averred that she began spending more of her school day in the counselor's office "to avoid the harassment in the halls." (Doc. # 149-6 at 5; Doc. # 149-7 at 3–4.)

Finally, in March 2018, S.T.C. alleged that a classmate at Everitt had pushed her into lockers at school. (Doc. # 135-2 at 39.) A.C. requested that Mr. Gomez not be involved in the response to this allegation so Assistant Principal Kathleen Lacy handled the investigation. (Doc. # 135 at 44.) Ms. Lacy and S.T.C. reviewed video footage together but could not find footage corresponding to S.T.C.'s allegation. (*Id.*; Doc. # 135-2 at 39.) In her affidavit, S.T.C. stated that "[a]t one point, I was asked to review some hallway video, but I told them that this was the wrong place, date, and time." (Doc.

# 149-6 at 5.) It is unclear if this statement refers to the time S.T.C. and Ms. Lacy viewed video footage together in March 2018.

During her first semester of eighth grade, S.T.C.'s grade point average ("GPA") was a 3.42, considerably higher than her average GPA. (Doc. # 135 at 40.) S.T.C. ended eighth grade with nearly the same grade point average that she had earned in seventh grade. (*Id.* at 41.) Eventually, S.T.C. left JeffCo. (Doc. # 149-6 at 5; Doc. # 149-7 at 4.)

## C.   TRAINING[11]

During S.T.C.'s two years at Everitt, JeffCo had official school board-enacted policies prohibiting discrimination based on sex and providing complaint and investigation procedures for claims of sex discrimination. (Doc. # 135 at 1–13.) Additionally, the 2016–2017 and 2017–2018 Everitt Student Handbook stated that sexual misconduct was prohibited and would be considered "malicious or dangerous" behavior that would result in discipline. (*Id.* at 99–100.) Teachers at Everitt were trained to report any allegations of sexual misconduct to an administrator. (Doc. # 135-6 at 8; Doc. # 135-7 at 6–8.)

---

[11] Plaintiffs did not provide any response to paragraphs 124–31 (Doc. # 134 at 16–17) of Defendants "Undisputed Material Facts". *See* (Doc. # 142 at 1–3.) The Court's practice standards require that opposing parties "admit or deny the movant's asserted material facts . . . in separate correspondingly numbered paragraphs," and that "[a]ny denial be accompanied by a brief factual explanation for the reason(s) for the denial and a specific reference to material in the record supporting the denial." Civ. Practice Standard 7.1D(b)(4). Therefore, the Court treats all facts contained in paragraphs 124–31 as undisputed.

**D.**     **PROCEDURAL HISTORY**

Plaintiffs' Third Amended Complaint ("TAC") became the operative pleading in this case on April 7, 2020. (Doc. # 29.) In the TAC, Plaintiffs assert eight claims for relief: (1) violations of Title IX, 20 U.S.C. § 1681(a), for Defendants' deliberate indifference towards student-on-student assaults ("Claim One"); (2) violations of Title IX, 20 U.S.C. § 1681(a), for Defendants' discriminatory response to Plaintiffs' reports of sexual assault and harassment ("Claim Two"); (3) violations of Title IX, 20 U.S.C. § 1681(a), for Defendants' deliberate indifference to sexual harassment ("Claim Three"); (4) violations of equal protection under the Fourteenth Amendment for gender discrimination ("Claim Four"); (5) violations of equal protection under the Fourteenth Amendment for deliberate indifference to known sexual harassment ("Claim Five"); (6) violations of substantive due process under the Fourteenth Amendment for failure to aid a police investigation of S.T.C.'s harassment ("Claim Six"); (7) violations of due process under the Fourteenth Amendment for Defendants' failure to train ("Claim Seven"); and (8) violations of the First and Fourteenth Amendments for Defendants' infringement of S.T.C.'s freedom of expression ("Claim Eight"). *See generally* (*id.*).

In April 2021, Defendants moved to dismiss all of Plaintiffs' claims except Claims Two and Three. *See* (Doc. # 33); *see also* (Doc. # 46 at 4.) The Court referred Defendants' Partial Motion to Dismiss to Magistrate Judge S. Kato Crews. (Doc. # 36.) Judge Crews issued his Recommendation (Doc. # 47) on February 22, 2021, to which Plaintiffs timely objected (Doc. # 48). Thereafter, the Court adopted in part and rejected

in part Judge Crews' Recommendation, resulting in the dismissal without prejudice of claims six and eight. (Doc. # 52.)

Defendants filed the instant Motion for Summary Judgement on Plaintiffs' six remaining claims on September 15, 2023. (Doc. # 134.) Plaintiffs filed their Response (Doc. # 142) and supporting evidence which included an affidavit by former Everitt student Annie Maxwell (Doc. # 149-3). On November 17, 2023, Defendants filed their Motion to Strike Testimony of Annie Maxwell. (Doc. # 154.) Both Motions are now ripe for review. *See* (Docs. ## 156, 160–61.)

## II.     LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *See id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In

attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in his favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671.

### III.   DISCUSSION

### A.   "SHAM AFFIDAVITS"

The Court will first consider Defendants argument that S.T.C.'s affidavit (Doc. # 149-6), A.C.'s affidavit (Doc. # 149-7), and the affidavits of five former Everitt students (Docs. ## 149-1; Doc. # 149-2; Doc. # 149-4; Doc. # 149-5; Doc. # 149-9), all of which were submitted by Plaintiffs in opposition to Defendants' Motion for Summary Judgment, should be disregarded as "sham affidavits" written to create disputes of fact.

(Doc. # 156 at 10–11.) In *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2001) the United States Court of Appeals for the Tenth Circuit held that the district court did not abuse its discretion in excluding an affidavit that "directly contradicted certain positions previously taken by [the affiant]" because the circumstances supported a conclusion that the affidavit sought to create a "sham fact issue." *Id.* at 973 (emphasis omitted). In reaching that conclusion, the Tenth Circuit identified three factors relevant to "whether a contradicting affidavit seeks to create a sham fact issue": (1) whether "the affiant was cross-examined during his earlier testimony"; (2) whether "the affidavit was based on newly discovered evidence"; and (3) whether "the earlier testimony reflects confusion which the affidavit attempts to explain." *Id*.

"However, before applying the *Ralston* factors, a court must determine whether the affidavit at issue directly contradicts the previous deposition testimony." *Miller v. State Farm Mut. Auto Ins. Co.*, No. 21-cv-00216-PAB-STV, 2023 WL 2140105, at *3 (D. Colo. Feb. 21, 2023) (citing *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1218 n.3 (10th Cir. 2014) (holding that a witness's affidavit did not "fit[ ] the sham affidavit paradigm" because it did not "contain any allegations that would directly contradict [the witness's] earlier deposition testimony") (internal quotation marks omitted); *Law Co., Inc. v. Mohawk Constr. & Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (finding that the district court abused its discretion by excluding affidavits without first identifying how they conflicted with prior deposition testimony)).

Defendants appear to argue for a broad application of the sham affidavit paradigm—asserting that because affiants were deposed regarding the same topics

that they address in their affidavits, the affidavits should be disregarded in their entirety. *See* (Doc. # 156 at 10–11.) Defendants also appear to argue that S.T.C.'s affidavit should be disregarded because it contradicts her mother's deposition testimony, and vice versa. *See, e.g.*, (*id.* at 4.) However, the case law does not permit such broad applications. *See Law Co.*, 577 F.3d at 1169. Rather, courts are permitted to disregard affidavits or portions thereof only where direct contradictions exist between the affidavit and the affiant's own deposition testimony. *Knitter*, 758 F.3d at 1218 n.3; *Law Co.*, 577 F.3d at 1169.

The vast majority of the assertions made in the seven affidavits Defendants seek to exclude do not directly contradict the deposition testimony of the affiant. Rather, they add additional details and, in some cases, contrast the testimony of other deponents.

For example, Defendants point to S.T.C.'s assertions regarding her feelings around changes to her eighth-grade schedule as evidence that S.T.C.'s affidavit is a "sham" and should be disregarded. (Doc. # 156 at 2.) However, S.T.C.'s affidavit merely adds additional detail to her deposition testimony. During S.T.C.'s deposition, the following exchange took place:

> Q: So [looking at the school contact log] if we go down to August 2nd, do you see that? And that's in person. And this is an entry by Allison MacDonald. And she wrote, Mom and grandma came in during registration to discuss having science class with one of the alleged perpetrators. J. Gomez met with mom and grandma. Schedule change done to make sure [S.T.C.] does not have any classes with any of the boys. Does that—
> A: Yes.
> Q: Does that refresh your memory about what happened?
> A: Yes.
> Q: . . . but you recall actually having been part—a part of this conversation with Mr. Gomez?

A: Yes.
Q: Okay. And is what Ms. MacDonald put in here accurate, as far as you recall?
A: Correct. Yes, accurate. Yeah.
. . .
Q: And—you and your mom indicated that this change was—was okay with you, right?
A: Yes.

(Doc. # 135-2 at 21–22.)

On the topic of this meeting, S.T.C.'s affidavit states:

48. When we went to the school to sort [the schedule issue] out, my mom and I met with Principal Gomez.
49. When we told them that I couldn't be in a class with [S.R.] and [R.R.] because of my assaults, the only solution that Mr. Gomez could offer was to move me out of my classes.
50. This was upsetting to me because at the time, Everitt split each grade in half, each with its own hallway. In one hallway were the advanced and honors classes. In the other were the remedial classes.
51. The only solution that Mr. Gomez was willing to offer was that I should move to the remedial hallway to avoid [S.R.] and [R.R.].
. . .
53. I was told that if I didn't want to have classes with [S.R.] and [R.R.], I would have to move because I was the one with the problem with them.
54. I couldn't be in the same classes as my assailants, so I agreed to switch out of the honors classes and move to the remedial hallway.

(Doc. # 149-6 at 3.)

The Court finds no direct contradiction between these pieces of evidence. S.T.C.'s affidavit and deposition testimony are consistent that she "agreed" with the schedule change. However, as Defendants acknowledge, S.T.C.'s affidavit expands upon her testimony by "attempt[ing] to explain why she agreed" to the scheduling change. (Doc. # 156 at 3.) Defendants further acknowledge that S.T.C. "never testified that she was upset or unhappy with the schedule change." (*Id.* at 8.) It is true that S.T.C.'s affidavit contradicts Ms. MacDonald's testimony that she would not have

changed S.T.C.'s schedule unless S.T.C. and A.C. "felt good about and happy with" the change. (Doc. # 135-7 at 10–12.) However, such contradictions between deponents or between a deponent and an affiant are not unusual and do not fall within the sham affidavit framework.

It is also true that there are instances where A.C.'s affidavit directly contradicts S.T.C.'s testimony, and vice versa. For example, A.C.'s affidavit states that

12. Over the summer, I repeatedly asked the police for a restraining order.
13. I was told by the police that without some information from the school, they would not be able to put a restraining order in place.
14. [S.T.C.] was not a part of those conversations and did not have knowledge about how to get a restraining order.

(Doc. # 149-7 at 1.) This may contradict S.T.C.'s testimony that she and her mother chose not to obtain a civil restraining during the summer before eighth grade. (Doc. # 135-2 at 31.) A.C.'s affidavit is, however, completely consistent with her own deposition testimony on the topic of the restraining order. (Doc. # 157-1 at 7–8.) The potential contradiction between A.C.'s affidavit and S.T.C.'s deposition testimony falls outside the sham affidavit framework which permits courts to disregard affidavits only where they directly contradict the affiant's own testimony. *Knitter*, 758 F.3d at 1218 n.3; *Law Co.*, 577 F.3d at 1169.

Regarding the affidavits of the five former Everitt students, Defendants attached these former students' depositions but made no attempt to point to specific contradictions. (Doc. # 156 at 11.) Rather, Defendants appear to argue that these affidavits should be disregarded in their entirety simply because the affiants were deposed. (*Id.*) Comparing the affidavits to the deposition testimony of each student, the

Court notes that there is some variation, that the deposition testimony often contains additional nuances, and some statements in the affidavits appear to be speculative. However, the Court finds very few, if any, direct contradictions.[12] *Compare* (Docs. ## 149-1; 149-2; 149-4; Doc. # 149-5; 145-9), *with* (Doc. # 157-4 at 6–10; Doc. # 157-10 at 5–8; Doc. # 157-5 at 6–10; Doc. # 157-11 at 6–9; Doc. # 157-6 at 6–11.) Therefore, the Court will not disregard these affidavits in their entirety. However, the Court generally finds these students' depositions more detailed, and thus, relies on those to the extent possible.

After carefully reviewing the seven affidavits Defendants seek to have excluded as shams, and the corresponding deposition testimony, the Court finds only three direct contradictions:

- Paragraph 45 of S.T.C.'s affidavit reads: "As the summer came to an end, I received my schedule and I learned that I was placed into a history class with [R.R] and a science class with [S.R.]." (Doc. # 149-6 at 3.) This directly contradicts S.T.C.'s testimony that she was only scheduled to have one class, science, with S.R. (Doc. # 157 at 11);

- Paragraphs 70 and 71 of S.T.C.'s affidavit states that she "spoke with both Mr. Gomez and Ms. MacDonald and gave them the names of all of the boys [who

---

[12] For example, multiple former students used the word "game" to describe SAF or TTT, or agreed with defense counsel's characterization of SAF or TTT as "like a game." *See* (Doc. # 157-5 at 6; Doc. # 157-10 at 5.) In their affidavits, these students state that SAF and/or TTT "were not a game." (Doc. # 149-2 at 2; Doc. # 149-4 at 2.) The Court does not read this as directly contradictory. Rather, in context, the Court understands these students to be stating in their affidavits that TTT and SAF were not a game **to them**, which does not contrast their testimony that other students perceived the behaviors to be done in jest.

had been harassing her following R.R. and S.R.'s removal from Everitt] that I could remember. I didn't know the names of every boy, but I gave them a lot of names." (Doc. # 148-6 at 4.) This directly contradicts S.T.C.'s testimony that she was only able to identify one of her bullies, Q.P., and only provided his name to Mr. Gomez and Ms. MacDonald. (Doc. # 157 at 21–22);

- Paragraph 79 of S.T.C.'s affidavit reads: "For a while, I continued to complain to both Mr. Gomez and Ms. MacDonald about this harassment I was undergoing at Everitt by these boys." (Doc. # 149-6 at 5.) Given the full context of the affidavit, the Court understands this paragraph as referring to the period of time following her November 15, 2017 report of harassment by friends of S.R. and R.R. *See* (*id.* at 4.) As it relates to Mr. Gomez specifically, this paragraph directly contradicts S.T.C.'s testimony that following her November 15 report, she did not make any other reports of harassment to Mr. Gomez for the remainer of her eighth-grade year.[13] (Doc. # 157 at 22.)

The Court agrees with Defendants that, for these specific paragraphs, S.T.C. was cross examined, her affidavit is not based on newly discovered evidence, and her deposition testimony contains no indications of confusion. *See Ralston*, 275 F.3d at 973. Accordingly, the Court will disregard these paragraphs of S.T.C.'s affidavit as seeking to establish "sham fact issues." *Id.*

---

[13] S.T.C. testified that she did make a report of harassment to Vice Principal Lacy. (Doc. # 135-2 at 39); *see also* (Doc. # 135 at 44.)

**B.      CLAIMS AGAINST JEFFCO**

As an initial matter, the Court notes that Plaintiffs concede that claims Four, Five, and Seven—the three remaining claims brought pursuant to the Fourteenth Amendment—should be dismissed as against JeffCo. (Doc. # 142 at 15, 18.) Therefore, the Court grants summary judgment in favor of JeffCo on these claims. The only remaining claims against the school district, are: (1) Claim One for JeffCo's deliberate indifference towards TTT and SAF in violation of Title IX, 20 U.S.C. § 1681(a); (2) Claim Two for JeffCo's discriminatory response to Plaintiffs' reports of sexual assault and harassment in violation of Title IX, 20 U.S.C. § 1681(a); and (3) Claim Three for JeffCo's deliberate indifference to sexual harassment during S.T.C.'s eight-grade year in violation of Title IX, 20 U.S.C. § 1681(a). The Court will address each claim in turn.

1.      <u>Claim One—Deliberate Indifference to Student-on-Student Assaults</u>

Plaintiffs' first claim for relief revolves around JeffCo's responsibility to end the alleged culture of TTT and SAF at Everitt. (Doc. # 29 at ¶¶ 73–82; Doc. # 142 at 10–12; Doc. # 156 at 11–12.) Title IX of the Education Amendments Act of 1972 provides, in relevant part, that "[n]o person . . . shall, on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Pursuant to the Supreme Court of the United States' decision in *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999), "[a] school recipient of federal funds may be liable under Title IX for its own conduct in being deliberately indifferent to student-on-student sexual harassment." *Rost ex rel. K.C. v. Steamboat Springs RE-2*

*Sch. Dist.*, 511 F.3d 1114, 1120 (10th Cir. 2008). To establish such school district liability under Title IX, a plaintiff must demonstrate that

> (1) an "'appropriate person' . . . with authority to take corrective action to end the discrimination" (2) had "actual knowledge of discrimination in the recipient's programs" but (3) "fail[ed] adequately to respond" in a manner amounting to "deliberate indifference," *Gebser* [*v. Lago Vista Indep. Sch. Dist.*], 524 U.S. [274,] 290 [(1998)], and (4) "the harassment was 'so severe, pervasive and objectively offensive that it . . . deprived the victim of access to the educational benefits or opportunities provided by the school,'" *Escue* [*v. N. Okla. Coll.*], 450 F.3d [1146,] 1152 [(10th Cir. 2006)] (omission in original) (quoting *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1246 (10th Cir. 1999)).

*Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1053 (10th Cir. 2023).[14]

Defendants first argue that Plaintiffs cannot establish that an appropriate person had actual knowledge of pervasive sexual harassment because "[a]ctual knowledge applies to the misconduct allegedly suffered <u>by the plaintiff,</u>" and it is undisputed that S.T.C. did not report assault or harassment to Mr. Carlin or Mr. Gomez before May 15, 2017. (Doc. # 156 at 11–12 (citing *Rost*, 511 F.3d at 119).) Defendants also allege that the actual knowledge standard requires school administrators to know that "the perpetrator"—here R.R. and S.R.—"posed a 'substantial risk' of abusing others." (*Id.* at 12 (citing *Rost*, 511 F.3d at 119; *Escue*, 450 F.3d at 1155).) However, Defendants' statements of the law related to actual knowledge are overly simplistic.

The Tenth Circuit recently reviewed the standard for actual knowledge in the context of a Title IX deliberate indifference claim against a school district in *Forth*, 85

---

[14] The parties do not dispute that JeffCo receives federal funding, or that Mr. Gomez was an "'appropriate person' with authority to take corrective action to end the discrimination." *See generally* (Docs. ## 134, 156.)

F.4th at 1054–57. Contrary to Defendants' summary, the Tenth Circuit explained that "[r]eported incidents of harassment against students other than the plaintiff may establish actual notice of the Title IX discrimination." *Id.* at 1056–57. The Tenth Circuit noted that courts remain divided on the issue of whether prior, as opposed to contemporaneous, complaints of gender-based or sexual harassment are sufficient to establish actual knowledge. *Id.* at 1056. Although not conclusively deciding to apply the "more permissive standard"—as the Tenth Circuit dubbed actual knowledge by means of prior complaints—the court has repeatedly considered whether prior complaints are "'too dissimilar' or 'too distant in time' compared to the harassment underlying the plaintiff's Title IX suit" to meet the actual knowledge prong. *Id.*; *see also Escue*, 450 F.3d at 1153–54.

As it relates to whether knowledge of the potential risks posed by the precise individual(s) who would go on to harass the plaintiff is required, the Court does not find evidence for this strict requirement in Defendants' cited case law. The plaintiff in *Rost* only argued that "the district had actual notice of the specific harassment of [the minor plaintiff.]" 511 F.3d at 1119. Thus, the Tenth Circuit did not consider whether prior reports of harassment to others by the same or different perpetrators were sufficient to demonstrate actual knowledge. In *Escue*—which concerned allegations of sexual harassment by a professor perpetrated against a student—the Tenth Circuit did consider prior reports of misconduct against the professor. 450 F.3d at 1154. However, the Court does not read this case as requiring such specific knowledge. Rather the Tenth Circuit simply says that schools are generally required to have "actual knowledge

of a substantial risk of abuse to students based on prior complaints by other students."
*Id.* (quoting cases).

It is undisputed that multiple former students who attended Everitt from 2010 through 2017—the year S.T.C. was in seventh grade—described a culture wherein male students touched female students' breasts on Tuesdays and their butts on Fridays without consent. (Doc. # 135-8 at 8–9; Doc. # 135-17 at 5–6; Doc. # 135-18 at 5–6, 9; Doc. # 157-3 at 3–4; Doc. # 157-4 at 6–10; Doc. # 157-5 at 6–8; Doc. # 157-6 at 8, 10; Doc. # 157-10 at 6; Doc. # 157-11 at 6.) However, the parties dispute the level of knowledge administrators, in particular Mr. Gomez, had regarding TTT and SAF. (Doc. # 135-6 at 24; Doc. # 149-16 at 7.) Although Mr. Gomez testified to only hearing "rumors" of harassment nearly identical to that which would eventually plague S.T.C., he also testified that he advised teachers "this is happening. This is escalating to a whole new level. You need to be aware of it." (Doc. # 135-6 at 24, 26–27.) These "rumors" may constitute recent prior reports sufficient to establish actual knowledge under the "more permissive standard," particularly given former students' testimony of the widespread and highly visible nature of TTT and SAF. (Doc. # 135-18 at 7–8; Doc. # 157-4 at 6–9; Doc. # 157-5 at 6–8; Doc. # 157-6 at 6–11; Doc. # 157-11 at 6, 8); *Forth,* 85 F.4th at 1060 ("The analytical focus [of the district court at the summary judgment stage,] should be on whether the evidence, viewed in its totality—could be said to have given a school district actual notice of a substantial risk of Title IX discrimination in its programs.").

The parties also dispute what actions, if any, Mr. Gomez took in response to the

"rumors" of TTT and SAF prior to S.T.C's May 2017 report. *Compare* (Doc. # 135-6 at 13–15, 26–27); (Doc. # 135-8 at 11–12); *with* (Doc. # 149-17 at 3; Doc. # 157-4 at 5; Doc. # 157-6 at 8–9; Doc. # 157-10 at 7.) Thus, the third element of Plaintiffs' deliberate indifference claim—the adequacy of the district's response—remains contested. *Forth*, 85 F.4th at 1053.

Finally, Defendants argue that TTT and SAF were insufficiently severe to be actionable under Title IX. In support, Defendants cite the testimony of former Everitt students describing TTT and SAF as "games" engaged in amongst friends. (Doc. # 135-8 at 8–9; Doc. # 135-17 at 5–6; Doc. # 135-18 at 5–9; Doc. # 157-3 at 3; Doc. # 157-5 at 8; Doc. # 157-6 at 6–7; Doc. # 157-10 at 5–6; Doc. # 157-10 at 5–6.) *See* (Doc. # 134 at 20.) The Supreme Court has acknowledged that, "[d]amages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender." *Davis*, 526 U.S. at 651–52. Rather, in the context of student-on-student harassment, Title IX claims are actionable "only where the behavior is so severe, pervasive, and objectively offensive **that it denies its victims the equal access to education** that Title IX is designed to protect." *Id.* (emphasis added). Thus, the standard for severity of gender-based harassment under Title IX is not whether victims and their peers—who in the instant case were children—considered the harassment offensive, as Defendants imply. (Doc. # 134 at 20.) Instead, the Court must consider whether the harassment caused victims to be deprived of equal educational opportunities. The Court notes that, "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a

question of fact." *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999).

In their Motion, Defendants do not discuss whether S.T.C. or other students subjected to TTT and SAF were denied equal access to educational opportunities at Everitt. *See generally* (Docs. ## 134, 156.) It is undisputed that S.T.C. did not take her final exams at the end of seventh grade, in eighth grade she took a remedial level science class to avoid being in the same honors class with S.R., and she eventually left JeffCo. (Doc. # 135-1 at 16; Doc. # 135-2 at 22; Doc. # 135-6 at 19; Doc. # 149-6 at 3, 5; Doc. # 149-7 at 2; Doc. # 149-11 at 5; Doc. # 157 at 9.) At least one former Everitt student also stated that she would "try to get out of going to school on Fridays to avoid being harassed" as part of SAF. (Doc. # 149-5 at 1.)

Given this evidence and Defendants' lack of relevant argument, the Court declines to conclude that Defendants have established the undisputed material facts entitle them to summary judgment based on the severity of the harassment. *See also Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1312 (10th Cir. 2020) (finding a plaintiff had adequately alleged severe harassment where months-long name calling and threats caused the plaintiff to go to great lengths to avoid the responsible students); *Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 377 F. Supp. 2d 952, 968 (D. Kan. 2005) (concluding that harassment consisting of years of insults, teasing, and name-calling which resulted in physical and mental manifestations of stress and anxiety, and the victim leaving school, was sufficiently severe and pervasive to withstand summary

judgment).

The Court has carefully reviewed the evidence, arguments, and case law related to Plaintiffs' Claim One. Construing the evidence in the light most favorable to Plaintiffs, drawing all inferences in their favor, and declining to infringe on the role of the jury, the Court concludes that Plaintiffs have demonstrated disputes of material fact remain related to the district's liability surrounding TTT and SAF. *Anderson*, 477 U.S. at 255; *Allen*, 119 F.3d at 839; *Forth*, 85 F.4th at 1054–66. Accordingly, summary judgment on this claim is inappropriate.

    2.    <u>Claim Two—Discriminatory Response to S.T.C.'s May 2017 Report</u>

As it relates to Claim Two, the Court reads Plaintiffs' complaint as alleging that the district—through Mr. Carlin and Mr. Gomez—engaged in gender-based discrimination against S.T.C. by (1) requiring her to "bear the costs of coming forward while [R.R. and S.R] were protected by the school and allowed to continue with their schedules," and (2) "intentionally work[ing] to stymie criminal investigations, withholding important protections from S.T.C." (Doc. # 29 at ¶¶ 86, 89; Doc. # 142 at 13 ("STC bases her deprivation of access to educational benefits on her being moved from the advanced and honors classes so that her attackers wouldn't be inconvenienced.")) Both parties treat Claim Two together with Claim Three and cite case law regarding student-on-student harassment in support of their arguments. (Doc. # 134 at 20–21; Doc. # 142 at 13; Doc. # 156 at 12–13.) The Court, however, finds this case law inapplicable as it reads Claim Two to allege gender-discriminatory conduct by Everitt's administrators, not

its students.

Rather than assessing Claim Two under the *Davis* standard outlined above, the Court will assess this claim pursuant to the *McDonnell Douglas* framework, which is employed in the Tenth Circuit when a party asserts that they were denied access to an educational opportunity on the basis of gender. *See Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176–80 (10th Cir. 2001); *Brown-Smith v. Bd. of Trustees of Univ. of N. Colo.*, No. 20-cv-03271-MEH, 2021 WL 2805448, at *5 (D. Colo. July 6, 2021). Under this burden-shifting framework, the plaintiff must first present a prima facie case of discrimination. *Gossett*, 245 F.3d at 1176. Upon such a showing, the burden then shifts to the institution to articulate a legitimate, non-discriminatory reason for its actions. *Id.* The burden then shifts back to the plaintiff to demonstrate the institution's articulated reason was pretextual. *Id.* at 1177.

To present a prima facie case of discrimination, S.T.C. must either present direct evidence that Mr. Gomez and/or Mr. Carlin intentionally discriminated against S.T.C. in their response to her report of assault, or circumstantial evidence sufficiently strong to raise an inference that their conduct was motivated by discriminatory animus. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). To meet this burden by means of circumstantial evidence, S.T.C. must demonstrate that she is a member of a protected class, that she suffered an adverse action, and that similarly situated non-members of her protected class were treated more favorably. *Id.* at 802–04.

The Court has previously concluded that S.T.C., R.R., and S.R., are similarly situated because all three students "were involved in the same sexual assault incidents

32

and . . . were in and/or wanted to take the same classes." (Doc. # 52 at 8–10.) It is undisputed that S.T.C., the only female student of the three, did not take her seventh-grade final exams, although R.R. and S.R., male students, did. (Doc. # 149-6 at 3; Doc. # 157 at 9.) It is also undisputed that, to avoid S.T.C. being in the same classes as her assailants in eighth grade, S.T.C. was switched to remedial level science while S.R. remained in the honors class. (Doc. # 135-1 at 16; Doc. # 135-2 at 22; Doc. # 135-6 at 19; Doc. # 149-6 at 3, 5; Doc. # 149-7 at 2; Doc. # 149-11 at 5.) Based on these examples of differentiated treatment, the Court concludes that S.T.C. has met her initial burden to present a prima facie case that the school's internal response to S.T.C.'s report of abuse was discriminatory.

Although not arguing within the *McDonnell Douglas* framework explicitly, the Court reads Defendants brief as justifying their actions by claiming that prior to the issuance of a restraining order or criminal charges against R.R. and S.R., the options available to them were limited. (Doc. # 134 at 6, 10 n.1, 20; Doc. # 142 at 2); *see also* (Doc. # 135-2 at 30; Doc. # 135-4 at 16; Doc. # 135-4 at 1.) However, Plaintiffs dispute this, and the only law or policy Defendants cite in support of this claim is Colo. Rev. Stat. 22-33-105(5)(a). This statute permits a school to expel a student following the filing of a petition in juvenile court alleging unlawful sexual behavior and a determination that the student should not be educated in the school. However, this provision sheds no light on the district's options prior to the initiation of a juvenile court case. The Court also notes that Q.P., a student who S.T.C. alleges harassed her in eighth grade, was moved out of the classes he shared with S.T.C. despite there being no juvenile court case

against him. (Doc. # 135 at 72.) Due to the lack of evidence supporting Defendants' non-discriminatory rationale, the Court concludes that Defendants have failed to carry their burden under *McDonell Douglas's* second step.

As it relates to Mr. Carlin's alleged obstruction of the law enforcement investigation, the Court finds that S.T.C. has not presented evidence of intentional discrimination. It is undisputed that on May 16, 2017, Officer Cuney asked for, and received, "everything [Mr. Carlin] had up until [that] point." (Doc. # 147-11 at 2.) R.R. and S.R.'s statements were taken the next day. (Doc. # 135 at 76–77; Doc. # 135-3 at 18.) WRPD then "decided" to wait until school was back in session to seek additional evidence. (Doc. # 149-11 at 5.) R.R. and S.R.'s statements were provided to WRPD the day after Officer Cuney reached out to Mr. Carlin in late September. (*Id.*)

Accordingly, the Court grants Defendants' Motion for Summary Judgment as it relates to S.T.C.'s claim that the district discriminated against her by obstructing the law enforcement investigation into R.R. and S.R. In all other respects, the Motion is denied as to Claim Two.

3.    Claim Three—Deliberate Indifference to S.T.C.'s November 2017 and March 2018 Reports

For the purposes of Claim Three, the same four elements outlined in the Court's discussion of Claim One are analyzed only as they apply to the actions taken by Everitt administrators following S.T.C.'s November 2017 and March 2018 reports of harassment by Q.P. and other boys. (Doc. # 29 at ¶¶ 93–102; Doc. # 142 at 14.) Defendants argue that "no rational jury would conclude that school officials were deliberately indifferent to S.T.C.'s allegations." (Doc. # 134 at 20–22.) In support, they

assert that following S.T.C.'s reports "staff addressed the issue, but S.T.C. could again not identify anyone who bothered her." (*Id.* at 21–22; Doc. # 156 at 13–14.)[15]

A district is deliberately indifferent to student-on-student harassment where the response "to harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. "Deliberate indifference may be shown by a failure to act to halt the misbehavior." *Doe*, 970 F.3d at 1314 (citing *Davis*, 526 U.S. at 654.) However,

> [t]his "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." [*Davis*, 526 U.S. at 648.] Indeed, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.*; *see Stiles v. Grainger Cty., Tenn.*, 819 F.3d 834, 849 (6th Cir. 2016) (although continuing harassment by fellow students required plaintiff student to transfer to another school, school was not liable because its prompt, tailored, and repeated responses to the harassment— including interviewing the victim, other students, and teachers, and disciplining students with verbal warnings and suspensions—established that it was not deliberately indifferent); *see also Porto v. Town of Tewksbury*, 488 F.3d 67, 75 (1st Cir. 2007) (school was not deliberately indifferent since it "reasonably believed that it had been successful in stopping" the inappropriate behavior).

*Doe*, 970 F.3d at 1313. Title IX's deliberate indifference standard is a "high" one.

*See Escue*, 450 F.3d at 1155.

The Court concludes that the undisputed material facts establish that the

---

[15] Defendants also make various arguments related to the responses they took following S.T.C.'s May 2017 report of sexual misconduct by R.R. and S.R. (Doc. # 134 at 20–22.) However, the Court disregards these arguments because Claim Three only alleges deliberate indifference to S.T.C.'s report of harassment by friends of R.R. and S.R. following the boys' departure from Everitt. (Doc. # 29 at ¶¶ 93–102; Doc. # 142 at 14 ("STC's third claim arises from the school's failure to take any action to protect her from sexual harassment by her assailants' friends."))

response by Everitt administrators to S.T.C.'s November 2017 and March 2018 reports of harassment by eighth grade boys was not deliberately indifferent. It is undisputed that Mr. Gomez and Ms. MacDonald met with eight boys, including Q.P.—who the parties agree was specifically named by S.T.C.—the day after S.T.C. reported she was being harassed. (Doc. # 135-6 at 23; Doc. # 149-14 at 1–2; Doc. # 149-15 at 1.) The boys were warned that there would be consequences if additional incidents of harassment were discovered, and Q.P. was removed from the classes he shared with S.T.C. (Doc. # 135 at 72; Doc. # 149-14 at 1–2; Doc. # 149-15 at 1.) Whether Mr. Gomez chose these boys "to be proactive" or because S.T.C. identified them, is immaterial. All identified students were warned and/or disciplined. Thus, Mr. Gomez took steps to prevent further harassment.

Although Mr. Gomez may have taken "more aggressive action against [the boys,] it does not follow that the [district] was deliberately indifferent." *See Escue*, 450 F.3d at 1155. S.T.C. has not pointed to evidence properly before the Court that establishes Mr. Gomez knew his actions were "inadequate and ineffective." *Id.* (quoting *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000)). When S.T.C. came forward again in March 2018, Ms. Lacy attempted to investigate the allegations, but no responsible students were identified. (Doc. # 135 at 44; Doc. # 135-2 at 39.)

Accordingly, the Court concludes that S.T.C. has failed to point to admissible evidence which would allow a reasonable jury to find that Mr. Gomez and Ms. Lacy's responses to her reports of harassment during her eight-grade year were "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 643; *Adler*, 144

F.3d at 671. Thus, JeffCo was not deliberately indifferent to S.T.C.'s eighth grade harassment as a matter of law and summary judgment in favor of Defendants on this claim is appropriate.

## C.   CLAIMS AGAINST MR. GOMEZ AND MR. CARLIN

Pursuant to Plaintiffs' concessions, Claims Four, Five, and Seven remain only as they allege Fourteenth Amendment violations against Mr. Gomez and Mr. Carlin in their individual capacities. (Doc. # 142 at 15, 18.) S.T.C. alleges that Mr. Gomez and Mr. Carlin violated her constitutional rights by (1) discriminating against her on the basis of gender in their response to her May 2017 allegations of sexual assault by R.R. and S.R. (Claim Four), (2) responding to student-on-student harassment—including TTT and SAF as practiced at Everitt generally and as experienced by S.T.C. individually, and the name-calling and bullying of S.T.C. following R.R. and S.R.'s departure from Everitt—in a deliberately indifferent manner (Claim Five), and (3) by failing to train and supervise teachers appropriately in response to reports of TTT and SAF (Claim Seven). (Doc. # 29 at ¶¶ 103–20; 131–37.)

Mr. Gomez and Mr. Carlin argue that summary judgment in their favor is appropriate on these three claims because they are entitled to qualified immunity. (Doc. # 134 at 27–30; Doc. # 156 14–15.)

### 1.   Applicable Law

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties

reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). When a section 1983 defendant raises a qualified immunity defense, the plaintiff bears the burden of overcoming it. *Simpson v. Little*, 16 F.4th 1353, 1359 (10th Cir. 2021). Courts employ a two-pronged test to analyze a qualified immunity defense. The Court has the discretion to consider these prongs in any order. *Leverington v. City of Colorado Springs*, 643 F.3d 719, 732 (10th Cir. 2011). Under the first prong, the plaintiff must raise a genuine issue of material fact that the defendant's own actions violated her constitutional or statutory rights. *Simpson*, 16 F.4th at 1359; *Messeri v. Univ. of Colorado, Boulder*, No. 18-CV-2658-WJM-SKC, 2019 WL 4597875, at *16 (D. Colo. Sept. 23, 2019). To do so, a plaintiff must show the individual defendant was personally involved in the alleged constitutional deprivation. *Foote v. Spiegel*, 118 F.3d 1416, 1423–24 (10th Cir. 1997). This requires that the defendant had actual knowledge of and acquiesced to the challenged conduct. *Jojola v. Chavez*, 55 F.3d 488, 490 (10th Cir. 1995).

Under the second prong, the plaintiff must demonstrate that the right was clearly established at the time of the alleged misconduct. *Messeri*, 2019 WL 4597875, at *16. A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he or she was doing violates that right. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)) (internal quotations omitted). In this circuit a right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains."

*Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted).

Clearly established law should not be defined at a high level of generality. *White v. Pauly*, 580 U.S. 73, 79 (2017) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)) (internal quotations omitted). "Although a plaintiff need not identify a case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate." *Ali v. Duboise*, 763 F. App'x 645, 650 (10th Cir. 2019) (citing *Mullenix*, 577 U.S. at 12) (internal quotations omitted); *see also White*, 580 U.S. at 79. But the Tenth Circuit has also repeatedly counseled that "[w]e cannot find qualified immunity whenever we have a new fact pattern." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007).

2.    Claim Four—Discriminatory Response to S.T.C.'s May 2017 Report

Similar to Claim Two above, Claim Four alleges that Mr. Gomez and Mr. Carlin personally discriminated against S.T.C. on the basis of gender in their response to her May 2017 report of sexual assault. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "Denials of equal protection by . . . a person acting under color of state law are actionable under 42 U.S.C. § 1983." *Murrell*, 186 F.3d at 1249. As noted above, the Court previously concluded that S.T.C., R.R., and S.R. are similarly situated. (Doc. # 52 at 8–10.) Thus,

under the first prong of the qualified immunity analysis, to establish a constitutional

violation S.T.C. must only establish that Mr. Gomez and Mr. Carlin deprived her of an

educational benefit or opportunity. *Sturdivant v. Fine*, 22 F.4th 930, 936 (10th Cir.

2022).

The Court concludes that Plaintiffs have satisfied this prong as it relates to Mr.

Gomez's involvement in, actual knowledge of, and acquiescence to, S.T.C.'s schedule

change for eighth grade. (Doc. # 135 at 42; Doc. # 135-1 at 15–16; Doc. # 135-2 at 21–

22; Doc. # 135-5 at 6; Doc. # 135-6 at 19; Doc. # 135-7 at 9.) This change resulted in

S.T.C. moving to a remedial science class while S.R. remained in the advanced class.

(Doc. # 149-6 at 3; Doc. # 149-11 at 5.) Mr. Carlin was not involved in this scheduling

change. (Doc. # 135-2 at 19–20; Doc. # 157 at 11.) Additionally, although S.T.C.'s

inability to safely take her seventh-grade final exams may constitute another

educational deprivation, S.T.C. testified that she did not speak to Mr. Carlin or Mr.

Gomez about her desire to take her exams. (Doc. # 157 at 9.)

The Court also concludes that S.T.C.'s right to equal educational opportunities

was clearly established in 2017. As the Tenth Circuit recently explained,

> "[G]eneral statements of the law are not inherently incapable of giving fair
> and clear warning" that particular conduct is unconstitutional. *Hope v.
> Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)
> (quoting *United States v. Lanier*, 520 U.S. 259, 271, 117 S. Ct. 1219, 137
> L. Ed. 2d 432 (1997)). "[A] general constitutional rule . . . may apply with
> obvious clarity to the specific conduct in question" even if no court has held
> that conduct unlawful. *Id.* (quoting *Lanier*, 520 U.S. at 271, 117 S. Ct. 1219);
> *see also Taylor v. Riojas*, —— U.S. ——, 141 S. Ct. 52, 54, 208 L. Ed. 2d
> 164 (2020) (per curiam) (concluding that the extreme facts did not require
> a case on point because "any reasonable officer should have realized that
> [the plaintiff]'s conditions of confinement [had] offended the Constitution").

> We recently recognized that the Equal Protection Clause prohibits the "intentional, arbitrary and unequal treatment of similarly situated individuals . . . ." *Ashaheed v. Currington*, 7 F.4th 1236, 1247 (10th Cir. 2021) (quoting *A.N. ex rel. Ponder v. Syling*, 928 F.3d 1191, 1198 (10th Cir. 2019)).

*Sturdivant*, 22 F.4th at 938.

The Supreme Court has long recognized the constitutional right of individuals to be free from gender-based discrimination. *See Davis v. Passman*, 442 U.S. 228, 234–35 (1979). Although many of the cases explicitly discussing this right arise in the employment context, the Tenth Circuit has held that employment-based cases provide sufficient notice to educational institutions that behavior "which gives rise to a violation of equal protection in the employment context will also do so in the teacher-on-student context." *Sh.A. ex rel. J.A. v. Tucumcari Mun. Schs.*, 321 F.3d 1285, 1289 (10th Cir. 2003). Finally, implicit in the Tenth Circuit's holdings that sexual harassment can constitute gender-based discrimination actionable under the Fourteenth Amendment, is a clearly established right to be free from direct gender-based discrimination. *See Starett v. Wadley*, 876 F.2d 808, 814 (10th Cir. 1989) ("We hold that sexual harassment of the sort alleged by plaintiff can violate the Fourteenth Amendment right to equal protection of the laws.")

Given this long-standing recognition of female students' rights to equal treatment, Mr. Gomez had fair notice that the Equal Protection Clause would prohibit gender-based scheduling changes which would result in the deprivation of educational opportunities. Therefore, the Court finds that Mr. Gomez is not entitled to qualified immunity with respect to Claim Four.

3.    Claim Five—Deliberate Indifference to Student-on-Student Harassment

The constitutional right S.T.C. alleges was violated in Claim Five was also clearly established at all times relevant to this litigation. *See Doe v. Roaring Fork Sch. Dist.*, 510 F. Supp. 3d 971, 977 (D. Colo. 2020). In *Murrell*, decided in 1999, a student alleged that school officials denied her equal protection by refusing to reasonably respond to known sexual harassment by another student. 186 F.3d at 1244, 1250–51. The Tenth Circuit denied the principal's and teachers' qualified immunity, holding "a person who exercises the state's supervisory authority may be held liable for consciously acquiescing in sexually harassing conduct by a non-state actor over whom the state actor has authority." *Id*. at 1251. *Murrell* clearly governs S.T.C.'s allegations of student-on-student harassment.

As discussed above, S.T.C. has established disputes of material fact regarding (1) Mr. Gomez and Mr. Carlin's level of knowledge of TTT and SAF during S.T.C.'s seventh grade and the preceding seven years, and (2) what response, if any, they took. *See Supra* Section III.B.1. Accordingly, the Court concludes that, as it relates to TTT and SAF as practiced at Everitt generally and as experienced by S.T.C. personally, S.T.C. has met her burden under both prongs of the qualified immunity analysis. *Simpson*, 16 F.4th at 1359; *Foote*, 118 F.3d at 1423–24; *Jojola*, 55 F.3d at 490; *Messeri*, 2019 WL 4597875, at *16.

However, as discussed above the undisputed material facts establish that Mr. Carlin was not involved in the responses to S.T.C.'s reports of harassment during eighth grade and that Mr. Gomez's responses were not "clearly unreasonable in light of the

known circumstances." *See Supra* Section III.B.3. Therefore, the Court concludes that both Mr. Carlin and Mr. Gomez are entitled to qualified immunity for Claim Five as it relates to the harassment S.T.C. experienced between November 2017 and March 2018. Defendants' Motion is otherwise denied as it relates to Claim Five.

      4.    <u>Claim Seven—Failure to Train</u>

      Finally, Plaintiffs allege that Mr. Gomez and Mr. Carlin had the responsibility to adequately train Everitt's teachers and staff to respond to TTT and SAF. (Doc. # 29 at ¶¶ 131–37.) Plaintiffs argue that the harassment S.T.C. experienced at Everitt was a direct and proximate result of this deliberately indifferent failure to train. (*Id.*) To establish section 1983 individual liability under a theory that a supervisor-defendant has violated the plaintiff's constitutional right in failing to train supervisees, a plaintiff must show:

> 1) an underlying violation of his constitution rights; 2) that the supervisor-defendant's personal involvement caused the misconduct complained of; and 3) that the supervisor-defendant acted with the state of mind or intent required to establish he committed a constitutional violation; specifically, at minimum, establish a deliberate and intentional act on the part of the defendant to violate the plaintiff's legal rights.

*Kemp v. Lawyer*, 846 F. Supp. 2d 1170, 1175 (D. Colo. 2012) (summarizing *Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010), *cert. denied* 563 U.S. 960 (2011); *Meyers v. Koopman*, No. 09-cv-02802-REB-MEH, 2011 WL 650328 (D. Colo. Feb. 11, 2011)).

      Plaintiffs do not dispute that JeffCo had official policies prohibiting gender-based discrimination and that staff were trained on these policies each year. (Doc. # 135 at 1–13.) It is also undisputed that teachers were trained to report sexual misconduct to administrators. (Doc. # 135-6 at 8; Doc. # 135-7 at 6–8.) In fact, Plaintiffs do not dispute

any material facts related to policies and training around discrimination and harassment at Everitt. (Doc. # 142 at 1–3.) Rather, Plaintiffs appear to rest their failure to train arguments on evidence that TTT and SAF were widespread and visible, and on the lack of evidence that TTT and SAF were discussed at staff meetings, assemblies, or in classrooms. (Doc. # 135-18 at 7–8; Doc. # 149-17 at 3; Doc. # 157-4 at 6–9; Doc. # 157-5 at 6–8; Doc. # 157-6 at 6–11; Doc. # 157-11 at 6, 8.)

However, the egregiousness of a constitutional violation is not sufficient to establish intentional failure to train. *See Kemp*, 846 F. Supp. 2d at 1177. Additionally, pointing to a lack of evidence is insufficient for Plaintiffs to meet their summary judgment burden to overcome Defendants' assertion of qualified immunity. *Jaramillo*, 680 F.3d at 1269; *Simpson*, 16 F.4th at 1359; *Dodds*, 614 F.3d at 1191. The Court concludes no reasonable jury could find that Mr. Gomez and Mr. Carlin deliberately and intentionally failed to train Everitt's teachers and staff to respond to TTT and SAF to violate S.T.C.'s legal rights. *See Dodds*, 614 F.3d at 1199–1200.

Accordingly, the Court concludes that Mr. Gomez and Mr. Carlin are entitled to qualified immunity on Claim Seven and Defendants' Motion for Summary Judgment is granted as it relates to this claim.

## IV.   CONCLUSION

For the foregoing reasons, Defendants Jefferson County R-1 School District, Jeff Gomez, and William Carlin's Motion for Summary Judgment (Doc. # 134) is GRANTED IN PART and DENIED IN PART. It is GRANTED with respect to:

- Claim Two's allegation that Mr. Carlin discriminated against S.T.C. on the basis

of her gender in his involvement with law enforcement's investigation into sexual misconduct.

- Claim Three.

- Claim Four, Five, and Seven as brought against JeffCo.

- Claim Four's allegations that Mr. Carlin discriminated against S.T.C. on the basis of her gender in his response to her May 2017 report of sexual misconduct.

- Claim Five's allegations that Mr. Carlin and Mr. Gomez were deliberately indifferent to S.T.C.'s reports of student-on-student harassment during her eighth-grade year.

- Claim Seven's allegations that Mr. Carlin and Mr. Gomez failed to adequately train teachers and staff to respond to TTT and SAF.

It is DENIED as to

- Claim One;

- Claim Two as it relates to JeffCo's school-based response to S.T.C.'s May 2017 report of sexual misconduct;

- Claim Four against Mr. Gomez;

- Claim Five's allegations that Mr. Carlin and Mr. Gomez were deliberately indifferent to student-on-student harassment in the form of TTT and SAF.[16]

---

[16] In summary, the following claims remain in this litigation: (1) Claim One against JeffCo only, (2) Claim Two against JeffCo only as it relates to the school-based response to S.T.C.'s May 2017 report of sexual misconduct by R.R. and S.R., (3) Claim Four against Mr. Gomez only, and (4) Claim Five against Mr. Carlin and Mr. Gomez only as it relates to their responses to TTT and SAF.

It is FURTHER ORDERED that Defendants' Motion to Strike Testimony of Annie Maxwell (Doc. # 154) is DENIED AS MOOT.

DATED: March 6, 2024

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge